## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GAL-INVENT KORLÁTOLT FELELŐSSÉGŰ
TÁRSASÁG,

     *Plaintiff*,

     v.

VANESSA RESEARCH HOLDINGS, INC.,
NORMAN GRAY, DMITRY KRAVTSOV, and
MARIA GRAY,

     *Defendants*.

Case No. 3:24cv1787(MPS)

### RULING ON NORMAN GRAY'S MOTION TO DISMISS

Gal-Invent Korlátolt Felelősségű Társaság ("Gal-Invent") brings this diversity action against Vanessa Research Holdings, Inc. ("Vanessa"), and certain of its officers, Norman Gray, Dmitry Kravtsov, and Maria Gray. Gal-Invent's claims arise out of "a fraud perpetrated by Vanessa and its top executives." ECF No. 1 ¶ 1. The complaint asserts claims for breach of contract, fraud, forgery, unjust enrichment, statutory theft, aiding and abetting fraud, violation of section 10(b) of the Securities Exchange Act of 1934, and the Connecticut Uniform Securities Act, or in the alternative, the Delaware Securities Act. Defendant Norman Gray, proceeding pro se, has filed a motion to dismiss. ECF No. 28. For the reasons that follow, the motion is denied.

## I.    Factual Background

The following is taken from the allegations of the complaint, which I accept as true for the purposes of this ruling.

Gal-Invent "is a Hungarian-incorporated company" with an office in Budapest. ECF No. 1 ¶ 15. Defendant Vanessa, a pharmaceutical research and development company, is a Delaware corporation with its principal place of business and corporate headquarters in Hamden,

Connecticut. *Id.* ¶¶ 2, 16. Defendant Norman Gray was the former CEO of Vanessa and resided in Hamden, Connecticut, until June 3, 2024, when he entered the custody of the United States Bureau of Prisons. *Id.* ¶ 17. Defendant Maria Gray, Norman's daughter, is Vanessa's Chief Medical Officer and a member of the Board of Directors and resides in Hamden. *Id.* ¶¶ 8, 18. Defendant Dmitry Kravtsov, the President of Vanessa, resides in Cheshire, Connecticut. *Id.* ¶ 16.

Gal-Invent was the majority owner of a company called "Hungaro-Gal," a successful mid-sized pharmaceutical company in Hungary. *Id.* ¶ 22. Norman Gray approached Gal-Invent indicating that Vanessa was looking to expand its operations and that Hungaro-Gal presented a seemingly perfect fit for acquisition by Vanessa. *Id.* ¶ 23. Gray held himself out as an MIT-educated Ph.D. worth hundreds of millions of dollars and a successful biomedical entrepreneur with a lengthy track record of successful companies. *Id.* ¶ 26. He indicated to Gal-Invent's representatives that Vanessa was funded by his family's trust, PG Trust, which consisted of "hundreds of millions of dollars." *Id.* ¶ 24. Gal-Invent visited Vanessa's and Gray's offices in Hamden, Connecticut in 2019. *Id.*

Gray indicated that Vanessa was in expansion mode and that if Gal-Invent agreed to a purchase deal, Vanessa would make significant improvements to Hungaro-Gal's facilities. *Id.* ¶ 25. Gray and Kravtsov represented to Gal-Invent that an outside investor was interested in a significant investment in Vanessa. *Id.*

After extensive negotiations, discussions, and a due diligence investigation of Hungaro-Gal by Vanessa, Vanessa and the owners of Hungaro-Gal, including Gal-Invent, reached an agreement for Vanessa to purchase Hungaro-Gal. *Id.* ¶ 6. On October 7, 2019, Vanessa purchased nearly all shares (97.4%) of Hungaro-Gal pursuant to a stock purchase agreement by and between Gal-Invent, Dr. Klara Tiszavari, and Tamas Csirisznyak, as sellers, and Vanessa Research Holdings

Inc. and Vanessa Research Magyarorszag Felelossegu Tarsagag, as purchasers (the "Hungaro-Gal SPA"). *Id.* As consideration for Gal-Invent's shares of Hungaro-Gal, Vanessa did not compensate Gal-Invent in cash but rather issued Gal-Invent 100,000 shares of Vanessa common stock at a par value of $.001 per share pursuant to a separate stock purchase agreement (the "Vanessa SPA"). *Id.* ¶ 7. Gal-Invent and Vanessa further entered into a Put Option Agreement (the "Original POA"), which gave Gal-Invent the option to sell back its shares of Vanessa to Vanessa for a minimum price of $3,000,000 ("Guaranteed Put Purchase Price") at any time between September 30, 2021 through November 30, 2021 (the "Exercise period"). *Id.* ¶ 29. The Original POA purported to be guaranteed by PG Trust. *Id.* ¶ 7. Kravtsov confirmed Gray's successful track record to induce Gal-Invent to accept the Vanessa SPA and Original POA in lieu of a cash payment. *Id.*

Before the November 30, 2021 deadline of the exercise period, Gray told Gal-Invent that Vanessa needed more time to be able to satisfy Vanessa's obligations in the event Gal-Invent exercised its option. *Id.* ¶ 31. When Gal-Invent responded that it was disinclined to enter an amended agreement, the defendants emailed Gal-Invent forged and/or fraudulent documents purporting to show that PG Trust, the guarantor of the original POA, was a legitimate and well-funded entity that could cover Vanessa's obligations. *Id.* The documents included a HSBC bank letter indicating that PG Trust had an investment portfolio "well in excess of £300,000,000." *Id.* ¶ 32. On November 26, 2021, Gal-Invent and Vanessa entered into an Amended POA. *Id.* ¶ 30. The Amended POA extended the exercise period to January 31, 2022. *Id.* ¶¶ 30, 35. Gal-Invent would not have agreed to the Amended POA but for the assurances by the defendants that PG Trust was flush with money and could easily guarantee the full $3,000,000 purchase price. *Id.* ¶ 33.

On January 19, 2022, within the timeframe set forth in the Amended POA, Gal-Invent notified Vanessa that it was exercising its right to sell back its 100,000 shares of Vanessa common

stock for the Guaranteed Put Purchase Price of $3,000,000. *Id.* ¶ 40. Vanessa was thereby obligated to repurchase the stock from Gal-Invent within 30 days. *Id.* ¶ 9. In the event Vanessa did not do so, PG Trust was obligated to do so. *Id.* Vanessa and PG Trust, however, failed to repurchase Vanessa's 100,000 shares of common stock. *Id.* In "numerous emails," Norman Gray confirmed to Gal-Invent that Vanessa would honor its obligation to make payment. *Id.* ¶ 42. In February and March of 2023, Kravtsov e-mailed Gal-Invent valuations of Vanessa that indicated that Vanessa was worth millions. *Id.* ¶ 44. But to date, neither Vanessa nor PG Trust have performed as required under the Amended POA by buying back the 100,000 shares for the put purchase price of $3,000,000. *Id.* ¶ 45.

As it turns out, Gray was not a multimillionaire scientist and entrepreneur with a Ph.D. from MIT, as he claimed, and Vanessa was not worth hundreds of millions of dollars, as he and Kravtsov claimed. *Id.* ¶ 13. As for PG Trust, it is a sham. *Id.* ¶ 10. It either does not exist or does not have the money claimed in the fraudulent HSBC Bank letter. *Id.* The HSBC letter purporting to show that PG Trust had "daily operational balance [...] in excess of £500,000 and Investment portfolio well in excess of £300 million" was a forgery. *Id.* ¶¶ 10, 32. The valuations of Vanessa were inflated and likely based on bogus assumptions provided by Vanessa. *Id.* ¶ 51. Unbeknownst to Gal-Invent, at the time Gray and Kravtsov were making these representations, Gray was under federal indictment in the Southern District of New York for wire fraud for which he was convicted in 2024. *Id.* ¶¶ 46, 51.

## II.    Discussion

Although Gray does not invoke the federal rule[1], the Court construes his motion as a motion

---

[1] The defendant's motion is a spartan one page, ten sentence document entitled "Motion to Dismiss Based on Lack of Jurisdiction." ECF No. 28. It states in toto:
    1. Plaintiff is a registered entity in Hungary;
    2. The subject of this action is a Hungarian registered company;

to dismiss for improper venue under Fed. R. Civ. P. 12(b)(3).[2]

"When faced with a Rule 12(b)(3) motion to dismiss for improper venue, a plaintiff has the burden of showing that venue in the forum district is proper." *MacCallum v. New York Yankees P'ship*, 392 F. Supp. 2d 259, 262 (D. Conn. 2005). "The court must take all allegations in the complaint as true, unless contradicted by the defendant's affidavits …." *Id.* "In analyzing whether the plaintiff has made the requisite prima facie showing that venue is proper, we view all the facts in a light most favorable to plaintiff." *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 384 (2d Cir. 2007). "The court must draw all reasonable inferences and resolve all factual conflicts in favor of the plaintiff." *Indymac Mortg. Holdings, Inc. v. Reyad*, 167 F. Supp. 2d 222, 237 (D. Conn. 2001). "If the venue is improper, the Court may dismiss or transfer the case to any district in which it could have been brought." *Id.* (internal quotation marks omitted). See 28 U.S.C. § 1406(a).

Gal-Invent argues that venue in the District of Connecticut is proper under 28 U.S.C. § 1391(b)(2). ECF No. 32 at 2. Section 1391(b)(2) provides in relevant part: "A civil action may be brought in… a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred . . . ." "'Substantiality' for venue purposes is more a qualitative than a quantitative inquiry, determined by assessing the overall nature of the plaintiff's claims and the nature of the specific events or omissions in the forum, and not by simply adding up the number

---

3. All transactions were consummated and occurred in Hungary.
4. It will not be possible for Defendants domiciled in the USA to properly litigate the merits and counterclaims to a foreign entity and its officers.

WHEREFORE, Defendant-NG, asks the Court:
1. To Dismiss this action for lack of proper venue and jurisdiction to cause a fair litigation for Defendants;
2. Defendants-NG be awarded costs and damages;
3. Any such other relief as the Court deems fair, just and reasonable;
4. To forgive any errors of this Motion, and be lenient with the *pro se* representation.

[2] Gray filed an answer and a motion to dismiss. Under Rule 12(h), an objection to venue is waived if it is not raised in the defendant's pre-answer motion or its first responsive pleading. Read liberally, his answer objects to venue, see ECF No. 27-1 ¶¶ 20-21, and I find he has not waived the defense. Gal-Invent does not argue otherwise.

of contacts." *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 432-33 (2d Cir. 2005). "Section 1391(b)(2) does not restrict venue to the district in which the 'most substantial' events or omissions giving rise to a claim occurred." *Id.* "Rather, … § 1391(b)(2) contemplates that venue can be appropriate in more than one district and permits venue in multiple judicial districts as long as a substantial part of the underlying events took place in those districts." *Id.* (internal quotation marks omitted). "Venue may be proper even if a greater part of the events giving rise to a claim happened in another forum." *City of New York v. Cyco.Net, Inc.*, 383 F. Supp. 2d 526, 543 (S.D.N.Y. 2005). Thus, when a plaintiff relies on § 1391(b)(2) to defeat a venue challenge, the court should (1) identify the nature of the claims and the acts or omissions that the plaintiff alleges give rise to those claims and then (2) determine whether significant events or omissions material to those claims occurred in this district. *Daniel*, 428 F.3d at 432.

Gal-Invent has demonstrated a prima facie case that venue is proper in this District under § 1391(b)(2). At its core, Gal-Invent's suit sounds in contract and fraud. Significant events material to these claims occurred in this district. Vanessa, headquartered in Connecticut, and its then CEO, Gray, approached Gal-Invent about acquiring Hungaro-Gal, during which Gray allegedly made fraudulent representations to induce Gal-Invent to sell Hungaro-Gal under a stock purchase plan, rather than a cash sale. Vanessa ultimately entered into various agreements with Gal-Invent. When Gal-Invent notified Vanessa that it sought to exercise its contractual right to sell back its 100,000 shares of Vanessa common stock for the Guaranteed Put Purchase Price of $3,000,000, Vanessa did not honor its contractual obligation. While Gray emailed Gal-Invent that Vanessa would honor its commitment, it failed to repurchase the stock. Kravtsov emailed Gal-Invent allegedly false financial documents attesting to the financial health of Vanessa.

Although the complaint is silent as to the location of these communications, it is a reasonable inference that communications regarding Vanessa's acquisition emanated from this District, the location of its headquarters.  So too when Gal-Invent notified Vanessa it wished to exercise its option under the contract to sell back its Vanessa shares, it is reasonable to infer that it notified Vanessa at its headquarters.  Similarly it is reasonable to infer that Vanessa's notifications to Gal-Invent that it was not able to honor its contractual obligation (i.e., the alleged breach) and the allegedly forged financial documents originated in this District.  *See Cold Spring Harbor Lab'y v. Ropes & Gray LLP,* 762 F. Supp. 2d 543, 555 (E.D.N.Y. 2011) ("[C]ourts have routinely held in the context of contract dispute cases that [venue] may be satisfied by a communication transmitted to or from the district in which the cause of action was filed, given a sufficient relationship between the communication and the cause of action.") (internal citation and quotation marks omitted) (collecting cases); *TBV Holdings Ltd. v. Schey*, No. 02 Civ. 1122, 2002 WL 1733649, at *1 (S.D.N.Y. July 26, 2002) (in determining venue, courts consider where contracts were drafted as well as negotiated and executed).  Drawing all reasonable inferences in the plaintiff's favor, as I must at this juncture, I find that a substantial portion of the events or omissions giving rise to plaintiff's claims occurred in this district.

Gray asserts in his motion that "[a]ll transactions were consummated and occurred in Hungary." ECF No. 28 at 2.  But the allegations suggest otherwise, and he cites no evidence in support.  And even if, for example, documents were executed in Hungary, the complaint still suggests that material events (such as communications and representations) occurred in or emanated from Connecticut.  As stated above, "venue can be proper in more than one district, and the court is not required to determine the best venue." *Marcus v. Am. Contract Bridge League*, 562

F. Supp. 2d 360, 363 (D. Conn. June 20, 2008).[3]  The motion to dismiss on the grounds of improper venue is denied.

Gray's motion also states that the complaint should be dismissed "for lack of … jurisdiction."  As noted, the motion is bereft of citation to any legal authority and the basis of Gray's argument is unclear.  To the extent that the defendant means that the Court lacks subject matter jurisdiction, that argument fails.  The Court clearly has both diversity and federal question jurisdiction.

### III.    Conclusion

The motion to dismiss (ECF No. 28) is denied.

IT IS SO ORDERED.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:  Hartford, Connecticut
        March 12, 2026

---

[3] Although not addressed in the plaintiff's opposition to this motion, the plaintiff earlier argued in opposition to a motion to transfer venue that venue is proper in this District under 28 U.S.C. § 1391(b)(1), which provides that a civil action may be brought in "(1)  a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located."  See ECF No. 45 at 1.  The complaint alleges that Vanessa has its principal place of business and headquarters in this District and that the individual defendants reside in Connecticut.  ECF No. 1 ¶¶ 16-19.  For purposes of § 1391(b)(1), "a natural person ... shall be deemed to reside in the judicial district in which that person is domiciled." § 1391(c)(1).  "A party's domicile is established at the time a case is filed … and it is determined by the party's place of residence and his intent to remain in that place indefinitely." *Fermin v. Moriarty*, No. 96 Civ. 3022(MBM), 2003 WL 21787351, at *2 (S.D.N.Y. Aug. 4, 2003).  Although Norman Gray is incarcerated elsewhere, "[i]t is well-established that a prisoner does not acquire a new domicile when he is incarcerated in a state different from his previous domicile. Instead, the prisoner retains his pre-incarceration domicile[,]" although this presumption is rebuttable.  *Universitas Educ., LLC v. Benistar*, No. 3:20-CV-00738 (JAM), 2021 WL 965794, at *17 (D. Conn. Mar. 15, 2021).